**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LOMBARD MEDICAL TECHNOLOGIES, INC., <br>                   Plaintiff, <br><br> v. <br><br> NILS JOHANNESSEN, THOMAS SASSLER, <br> and TRIVASCULAR, INC., <br>                   Defendants. | CIVIL ACTION NO. |

# VERIFIED COMPLAINT

## Introduction

Plaintiff, Lombard Medical Technologies, Inc. ("Lombard") and Defendant, TriVascular, Inc. ("TriVascular") are both medical device companies competing in a race to complete clinical trials, obtain FDA approval, and market their respective stent grafts to treat abdominal aortic aneurysms ("AAA"). Lombard is currently ahead in the United States race, having been in a clinical trial since 2005 as compared to TriVascular, which began its most recent clinical trial in 2010.

In an attempt to make up ground and disrupt Lombard's clinical trial, TriVascular has hired away, in flagrant disregard of their non-competition agreements with Lombard, Defendants Nils Johannessen ("Johannessen") and Thomas Sassler ("Sassler"), Lombard's only two Investigational Site Specialists (those employees responsible for clinical trial operations and sales in the United States and Canada). In so doing, TriVascular is attempting simultaneously to cripple Lombard's clinical trial and unfairly advance its own.

Accordingly, Lombard seeks a temporary restraining order and preliminary injunction against its former employees, Johannessen and Sassler, and their new employer, TriVascular, to

prevent the immediate and irreparable harm that will result from Johannessen's and Sassler's employment with direct competitor TriVascular in violation of their respective non-competition agreements. Absent immediate injunctive relief, Johannessen and Sassler will inevitably use and disclose Lombard's trade secrets and confidential information, and will harm its goodwill. Lombard also seeks damages for the breaches by Johannessen and Sassler of their non-competition agreements, and the interference by TriVascular with those agreements.

## Parties

1.     Lombard is a Delaware corporation organized under the laws of the State of Delaware with its principal place of business at all relevant times until May 1, 2010 in Wellesley Hills, Massachusetts. As of May 1, 2010, Lombard's principal place of business was relocated to Tempe, Arizona.

2.     Johannessen is, on information and belief, an individual resident of Maryland.

3.     Sassler is, on information and belief, an individual resident of Georgia.

4.     TriVascular is a corporation organized under the laws of the State of California with its principal place of business in Santa Rosa, California.

## Jurisdiction and Venue

5.     Subject matter jurisdiction exists pursuant to 28 U.S.C. §1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

6.     Personal jurisdiction exists over Johannessen and Sassler under M.G.L. c. 223A §3 because both individuals transacted business in Massachusetts, including but not limited to, executing the Agreement Regarding Inventions, Confidentiality and Non-Competition (the

"Non-Competition Agreement") in Massachusetts or mailing it to Massachusetts, periodically reporting to corporate headquarters in Massachusetts to consult with Lombard personnel, periodically traveling to Massachusetts to induce medical centers in Massachusetts to undertake clinical trials with Lombard, receiving paychecks from Massachusetts, and generating clinical trial sales for a Massachusetts company. Moreover, the Non-Competition Agreement expressly provides that it "shall be construed under and be governed in all respects by the laws of the State of Massachusetts."

7. Personal jurisdiction exists over TriVascular under M.G.L. c. 223A §3 because it transacts business in Massachusetts, contracts to supply products and services in Massachusetts, and has caused tortious injury in Massachusetts.

8. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a).

## Facts

### Lombard's Business

9. Lombard is a medical device company developing endovascular stent grafts and other medical products for use in the treatment of vascular disease. Its lead medical device is Aorfix™, an endovascular stent graft that provides for minimally invasive treatment of AAA (if untreated, AAA may rupture and cause death). Aorfix™ is designed to treat AAA in high-angled aortas (defined as a 60 to 90 degree bend) and regular-angled aortas (defined as less than 60 degrees of bend). Lombard, with its parent company Lombard Medical Technologies PLC, has spent approximately $85 million dollars and 12 years developing Aorfix™.

10. Before a company is permitted to commercialize and market a medical device it developed, the Food and Drug Administration ("FDA") requires that it conduct a clinical trial on

the device and achieve certain outcomes demonstrating the safety and efficacy of the device.  As a result, in November 2005, following conditional approval by the FDA, Lombard began its U.S. clinical trial on Aorfix™.

11. Lombard, acting through Johannessen and Sassler, has engaged medical centers throughout the United States and Canada to participate in its clinical trial on Aorfix™.  These medical centers refer patients with both regular and high-angled aortas who suffer from AAA to Lombard's clinical trial.

12. It is a highly-competitive process to convince medical centers to serve as clinical trial sites.  This process involves identifying and contacting the right decisionmakers, presenting studies about the medical device being tested in the clinical trial, understanding and articulating the differences between the medical device being tested in the clinical trial and the competing medical devices in the market, and articulating the methodologies and protocols to be used in the clinical trial.

13. Lombard is seeking approval from the FDA to commercialize and market its Aorfix™ device as treating both regular and high-angled aortas.

14. Lombard is conducting its clinical trial throughout the United States and Canada.  Upon FDA approval, Lombard will market Aorfix™ to hospitals throughout the United States.  It will similarly market Aorfix™ to hospitals throughout Canada following approval by the relevant Canadian authorities.

## TriVascular's Business

15. Like Lombard, TriVascular is a medical device company that is developing an

endovascular stent graft to treat AAA.

16. Also like Lombard, TriVascular is currently undertaking a clinical trial to obtain FDA approval for its endovascular stent graft. (Upon information and belief, TriVascular abandoned an earlier clinical trial in 2006 following several FDA warning letters.)

17. In order to conduct its current clinical trial, TriVascular, like Lombard, is seeking to engage medical centers to participate in its clinical trial and refer patients with AAA to its trial for treatment.

18. TriVascular's endovascular stent graft is called the "Ovation™ Abdominal Stent Graft."

19. TriVascular's target market is the same as Lombard's, namely, those U.S. hospitals treating patients with AAA.

20. TriVascular only recently began, on or about May 3, 2010, its U.S. clinical trial on the Ovation™ Abdominal Stent Graft.

## **Lombard And TriVascular Are Direct Competitors**

21. Only four companies in the United States have received FDA approval to sell stent grafts to treat AAA.

22. There are also only four companies in the United States (including Lombard and TriVascular) without FDA approval that are trying to break into the market by conducting clinical trials. As soon as these companies successfully complete their clinical trials, they will be able to compete in the market with the aforementioned four "established" companies.

23. Both Lombard and TriVascular believe that they have developed a stent graft that addresses and improves upon the shortcomings of the first-generation AAA stent grafts sold by the four "established" companies. Lombard and TriVascular are therefore now racing to successfully complete as quickly as possible their clinical trials, so that they can commercialize and market their respective "next generation" stent grafts. The speed at which each company advances in this race depends upon its ability to engage medical centers to participate in its clinical trial and enroll the number of AAA patients needed to satisfy the clinical trial's requirements.

### Johannessen's And Sassler's Employment With Lombard

24. Lombard employed Johannessen as an Investigational Site Specialist from August 13, 2007 to June 4, 2010.

25. Lombard employed Sassler as an Investigational Site Specialist from October 15, 2007 to June 7, 2010.

26. As Investigational Site Specialists, Johannessen and Sassler were responsible for identifying medical centers that would participate in Lombard's clinical trial; convincing such medical centers to refer patients to Lombard's clinical trial; analyzing patients' CT scans to determine their suitability for the clinical trial; liaising with the physicians participating in the clinical trial (including being in the operating room to guide physicians through deployment of the Aorfix™ stent); meeting with physicians to assess the strengths and weaknesses of the Aorfix™ stent; attending regular meetings with clinical teams at the enrolled medical centers; attending weekly business and strategy conference calls with Lombard's business, regulatory, clinical, sales and marketing personnel as well as the clinical research organization charged with

collecting data about the results of the clinical trial; and participating in informational and training meetings at which Lombard's confidential and proprietary information was disseminated and discussed.

27. As Lombard's sole two Investigational Site Specialists, Johannessen and Sassler were the face of Lombard, seeking to enroll new patients and new medical centers in the clinical trial, interacting regularly with the physicians participating in the trial, and managing most clinical aspects of the trial.

## The Non-Competition Agreement

28. At the inception of their employment, Johannessen and Sassler each signed the Non-Competition Agreement with Lombard. A true and correct copy of the Non-Competition Agreement signed by Johannessen is attached hereto as Exhibit A and is incorporated herein by reference. A true and correct copy of the Non-Competition Agreement signed by Sassler is attached hereto as Exhibit B and is incorporated herein by reference.

29. Each Non-Competition Agreement provides, *inter alia*, that Johannessen and Sassler will not compete with Lombard for a six-month period following their separation from employment.

30. Specifically, in Section 7 of the Non-Competition Agreement, Johannessen and Sassler each agree that for six months following their employment, they will not directly or indirectly:

> … whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity in the Restricted Region with respect to the Products or Services.

Also in Section 7 of the Non-Competition Agreement, Johannessen and Sassler state that they:

> …understand and agree that the restrictions set forth in this Section 7 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.

31. Section 7 of the Non-Competition Agreement defines the "Restricted Region" to mean "any location in which the Company operates or into which the Company directs the Products or Services."

32. Section 1(e) of the Non-Competition Agreement in turn defines Products or Services to mean:

> …the manufacture of, and conduct of clinical trials in connection with, the High Angle AORfix™ Bifurcated Stent Graft, or other products or services that are competitive with or similar to the products or services of the Company, or products or services which the Company has under development or which are the subject of active planning at any time during my employment.

## **Lombard's Proprietary and Confidential Information**

33. Section 2 of the Non-Competition Agreement requires Johannessen and Sassler to keep confidential Lombard's proprietary and confidential information. It provides, in pertinent part:

> I understand and agree that my employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information, and (b) the confidential information of others with which the Company has a business relationship. The information referred to in clauses (a) and (b) of the preceding sentence is referred to in this Agreement, collectively, as "**Confidential Information.**" At all times, both during the term of my employment and after its termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties to the Company.

(Emphasis added.)

34. Section 1(a) defines Proprietary Information as follows:

> As used in this Agreement, "Proprietary Information" means information which the Company possesses, or to which the Company has rights, whether reduced to writing (or in a form from which such information can be obtained, translated, or derived into reasonably useable form), or maintained in my mind or memory, which derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including, without limitation, any technical information relating to any device; protocol, trial enrollment data, information pertaining to the status of any trial, communications to and from the FDA, information relating to a device's regulatory status or correspondence to or from any clinical events committee or data safety monitoring board; research results; financial information, reports or forecasts; inventions, improvements and other intellectual property; trade secrets; know-how; designs, processes or formulae; software; marketing or sales information or plans; customer lists; business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) which have been discussed or considered by the management of the Company; and any information derived, summarized or extracted from any of the foregoing.  Proprietary Information includes information developed by me in the course of my employment by the Company, as well as other information to which I may have access in connection with my employment.

35. Johannessen and Sassler were privy to Lombard's Confidential Information, as defined in Section 2 of the Non-Competition Agreement.

36. Specifically, in their capacities as Investigational Site Specialists responsible for clinical trials, Johannessen and Sassler were privy to Lombard's critical confidential and proprietary information including, but not limited to, its trade secrets, technology, technical information relating to its products and services (including Aorfix™), processes and techniques, business and marketing plans, pricing and cost data, non-public clinical trial data and analyses, information regarding the relative strengths and weaknesses of its products, clinical trial design,

clinical trial agreements with medical centers (including information regarding the pricing and intellectual property provisions in such agreements), clinical trial methodologies, information regarding the identity of contacts and key decisionmakers at medical centers, and information regarding which paths in the clinical trial should be foregone.  Moreover, due to the complexity of the Aorfix™ medical device, Lombard trained Johannessen and Sassler extensively on the device, in so doing imparting to them confidential information about the device.

37.	A critical factor in ensuring Lombard's success is developing and enhancing its goodwill with the medical centers and physicians participating in the clinical trial, as they will likely be Lombard's customers once the Aorfix™ medical device receives FDA approval.  As a result, over the years Lombard has, at great expense and through Johannessen and Sassler, established and cultivated relationships with those medical centers, physicians, and clinical teams throughout the United States and Canada that treat patients with AAA.

## Johannessen's and Sassler's Resignations

38.	On or about May 4, 2010, Johannessen gave notice to Lombard of his voluntary resignation, effective June 4, 2010.

39.	On or about May 7, 2010, Sassler gave notice to Lombard of his voluntary resignation, effective June 7, 2010.

40.	Both Johannessen and Sassler informed Peter Philips, Founder and Chief Technology Officer of Lombard, that they had accepted employment with TriVascular and that they would be "doing the same thing as they did at Lombard," i.e., being responsible for identifying medical centers to participate in TriVascular's clinical trial, convincing such medical centers to refer patients with AAA to TriVascular's clinical trial for its competing Ovation™

Abdominal Stent Graft medical device, and analyzing patients' CT scans to determine their suitability for TriVascular's clinical trial.

41.     On information and belief, in an attempt to simultaneously advance its nascent clinical trial and cripple Lombard's advanced trial, TriVascular hired away Lombard's only two Investigational Site Specialists in disregard of their Non-Competition Agreements, to obtain Lombard's trade secrets and confidential information, harm its goodwill, and cripple its clinical trial through such improper means.

42.     On or about May 14, 2010, John Rush, the Chief Executive Officer of Lombard, met with Johannessen and Sassler individually and informed each that their employment with TriVascular would be in violation of their respective Non-Competition Agreements.  Mr. Rush asked Johannessen and Sassler to reconsider their resignations and even offered them additional consideration to remain employed by Lombard.

43.     Following the rejection by Johannessen and Sassler of Lombard's offer of continued employment, in a letter dated May 24, 2010, counsel for Lombard informed Johannessen and Sassler that their proposed employment with TriVascular would breach their contractual obligation not to compete with Lombard for six months following their termination of employment.

## Communication With TriVascular

44.     In a letter dated May 21, 2010, counsel for Lombard informed TriVascular that its proposed employment of Johannessen and Sassler would interfere with Lombard's Non-Competition Agreements with them, and attached copies of Johannessen's and Sassler's Non-Competition Agreements.

45. In a letter from TriVascular's counsel to Lombard's counsel dated May 28, 2010, TriVascular denied that its employment of Johannessen and Sassler would result in the violation of any legal obligations.

46. In a telephone call initiated by Lombard's counsel to TriVascular's counsel on June 3, 2010, TriVascular's counsel advised Lombard that TriVascular would be employing Johannessen and Sassler.

47. On information and belief, on the first business day following their effective dates of resignation from Lombard, Johannessen and Sassler commenced employment with TriVascular.

## TriVascular's Employment of Johannessen and Sassler Is In Violation Of The Continuing Obligations Johannessen and Sassler Have to Lombard

48. TriVascular knows that Johannessen and Sassler are bound by the Non-Competition Agreements.

49. Johannessen and Sassler are well aware that TriVascular is a direct competitor of Lombard.

50. Permitting Johannessen and Sassler to be employed by, and continue their employment with, TriVascular would give TriVascular an unfair competitive advantage over Lombard, inasmuch as it is inevitable that Johannessen and Sassler will, in the performance of their duties for TriVascular, use and disclose Lombard's trade secrets and confidential information and harm its goodwill.

## Count I

## Breach of Contract – Johannessen

51. Lombard restates and incorporates by reference its allegations in paragraphs 1 through 50.

52. The acts and conduct of Johannessen referenced above represent a breach of his Non-Competition Agreement.

53. Johannessen's breach of his Non-Competition Agreement presents an immediate threat of irreparable harm to Lombard. In addition, Johannessen has caused Lombard damages in an amount to be determined at trial.

## Count II

## Breach of Contract – Sassler

54. Lombard restates and incorporates by reference its allegations in paragraphs 1 through 50.

55. The acts and conduct of Sassler referenced above represent a breach of his Non-Competition Agreement.

56. Sassler's breach of his Non-Competition Agreement presents an immediate threat of irreparable harm to Lombard. In addition, Sassler has caused Lombard damages in an amount to be determined at trial.

## Count III

## Tortious Interference With Contractual Relations – TriVascular

57.     Lombard restates and incorporates by reference its allegations in paragraphs 1 through 56.

58.     TriVascular knows of Johannessen's and Sassler's continuing contractual obligations to Lombard under their respective Non-Competition Agreements, but has nonetheless opted to employ Johannessen and Sassler in flagrant disregard of such obligations for the improper purpose of obtaining Lombard's trade secrets and confidential information, harming Lombard's goodwill, and attempting to cripple Lombard's clinical trial through such improper means.

59.     By TriVascular's employment of Johannessen and Sassler, it has intentionally, improperly, and maliciously interfered with the existing contractual relationships between Lombard and Johannessen, and between Lombard and Sassler.

60.     As a direct and proximate result of TriVascular's conduct, Lombard has suffered and will suffer irreparable harm and monetary damages. There is no sufficient remedy at law for this breach.

## **Requests for Relief**

WHEREFORE, Lombard requests that this Court:

1.  Issue a Short Order of Notice on (a) its Motion for a Temporary Restraining Order and Preliminary Injunction, and (b) its Motion for an Order to Preserve Documents and Evidence, so that a hearing on both motions be scheduled on Friday, June 18, 2010, and a further preliminary injunction hearing be scheduled as soon as practicable thereafter.

2.  After a hearing, issue a temporary restraining order against Johannessen, Sassler, and TriVascular as follows:

    a.  temporarily restraining and enjoining Johannessen from working directly or indirectly, including, but not limited to, as an employee, consultant or independent contractor, on behalf of TriVascular until further order of the Court;

    b.  temporarily restraining and enjoining Sassler from working directly or indirectly, including, but not limited to, as an employee, consultant or independent contractor, on behalf of TriVascular until further order of the Court;

    c.  temporarily restraining and enjoining TriVascular from further interfering with Johannessen's or Sassler's contractual obligations to Lombard until further order of the Court;

    d.  temporarily restraining and enjoining TriVascular from directly or indirectly employing or engaging the services of Johannessen or Sassler, including, but not limited to, as employees, consultants or independent contractors, until further order of the Court;

    e. temporarily restraining and enjoining Johannessen, Sassler, and TriVascular from using or disclosing any of Lombard's confidential and proprietary information including, but not limited to, its trade secrets, technology, technical information relating to its products and services (including Aorfix™), processes and techniques, business and marketing plans, pricing and cost data, non-public clinical trial data and analyses, information regarding the relative strengths and weaknesses of its products, clinical trial design, clinical trial agreements with medical centers (including information regarding the pricing and intellectual property provisions in such agreements), clinical trial methodologies, information regarding the identity of contacts and key decisionmakers at medical centers, and information regarding which paths in the clinical trial should be foregone.

    f. directing Johannessen, Sassler, and TriVascular to return to Lombard, within three days following the date of the Order, any of Lombard's property or confidential and proprietary information that may be in their possession, custody or control, as well as any information or property that was created or derived therefrom.

  3. After a hearing, enter a preliminary injunction order against Johannessen, Sassler, and TriVascular as follows:

    a. restraining and enjoining Johannessen, until December 4, 2010, from working directly or indirectly, including, but not limited to, as an employee, consultant or independent contractor, on behalf of Defendant TriVascular;

    b. restraining and enjoining Sassler, until December 7, 2010, from working directly or indirectly, including, but not limited to, as an employee, consultant or independent contractor, on behalf of TriVascular;

   c. restraining and enjoining TriVascular from further interfering with Johannessen's or Sassler's contractual obligations to Lombard;

   d. restraining and enjoining TriVascular, until December 4, 2010, from directly or indirectly employing or engaging the services of Johannessen, including, but not limited to, as an employee, consultant or independent contractor;

   e. restraining and enjoining TriVascular, until December 7, 2010, from directly or indirectly employing or engaging the services of Sassler, including, but not limited to, as an employee, consultant or independent contractor;

   f. restraining and enjoining Johannessen, Sassler, and TriVascular from using or disclosing any of Lombard's confidential and proprietary information including, but not limited to, its trade secrets, technology, technical information relating to its products and services (including Aorfix™), processes and techniques, business and marketing plans, pricing and cost data, non-public clinical trial data and analyses, information regarding the relative strengths and weaknesses of its products, clinical trial design, clinical trial agreements with medical centers (including information regarding the pricing and intellectual property provisions in such agreements), clinical trial methodologies, information regarding the identity of contacts and key decisionmakers at medical centers, and information regarding which paths in the clinical trial should be foregone.

   g. directing Johannessen, Sassler, and TriVascular to return to Lombard, within three days following the date of the Order, any of Lombard's property or confidential and proprietary information that may be in their possession, custody or control, as well as any information or property that was created or derived therefrom.

4.  After a trial, enter a permanent injunction in the form set forth in Paragraph 3 above, and enter judgment and award Lombard its damages, attorneys' fees, costs and interests pursuant to Counts I through III of the Verified Complaint.

5.  Award Lombard such other relief as the Court may deem just and proper.

    LOMBARD MEDICAL TECHNOLOGIES, INC.,

    By its attorneys,

    /s/ *Ariella Feingold*_____
    Jonathan D. Rosenfeld (BBO #556172)
    Ariella Feingold (BBO #660380)
    Wilmer Cutler Pickering Hale and Dorr LLP
    60 State Street
    Boston, MA 02109
    (617) 526-6000
    jonathan.rosenfeld@wilmerhale.com
    ariella.feingold@wilmerhale.com

Dated: June 15, 2010


## **VERIFICATION**

John B. Rush hereby states that he is the Chief Executive Officer of Lombard; has read the within Verified Complaint; that the statements therein are true based upon his personal knowledge, except those statements based upon information, and those he believes to be true based on the information presented and available to him.

Signed under the pains and penalties of perjury this _15th_ day of June, 2010.

                                                                  /s/ *John B. Rush*\
                                                                    John B. Rush