## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LOMBARD MEDICAL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:10-cv-10995-NG |
| | ) | |
| NILS JOHANNESSEN, THOMAS SASSLER, | ) | <u>Leave to File Granted on 6/29/10</u> |
| AND TRIVASCULAR, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### SUPPLEMENTAL OPPOSITION OF DEFENDANTS
### TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Nils Johannessen and Thomas Sassler are non-managerial employees with more than 50 years of combined experience training cardiologists and vascular surgeons in the use of new medical devices. TriVascular, Inc. seeks to employ them to train physicians to use TriVascular's Ovation stent graft in an FDA clinical trial. Friends for 19 years, Johannessen and Sassler sought out TriVascular, Inc. because they believed that Lombard Medical Technologies, Inc., where they performed similar work as at-will employees for two and a half years, was struggling and that TriVascular, backed by $95 million in venture capital, offered them greater opportunities.

Neither Johannessen nor Sassler seeks to work in any of the hospitals they were assigned to at Lombard or to have contact with the personnel there. Indeed, TriVascular has agreed not to assign them even to the same city as any hospital participating in Lombard's five-year-old clinical trial.

Neither Johannessen nor Sassler knows anything confidential about Lombard's stent graft, which is described in detail in scholarly articles, FDA-mandated instructions for use and

- 1 -

patent filings.  Nor do they know any secrets about Lombard's clinical trial, which is described in detail on a National Institutes of Health website and about which Lombard provides regular public updates.  They have no information about Lombard's costs, agreements with hospitals or marketing or business strategy.

TriVascular has no use for information about any of these subjects because it has already committed to its own fundamentally different product design, its own FDA-approved clinical trial protocol and its own hospital agreements.  Moreover, neither Lombard nor TriVascular can sell its device in the United States until at least 2011 or 2102.  Even then, Lombard's larger-profile but more flexible "high-angle" stent graft will be used primarily by patients with bends in their aortas of more than 60 degrees -- patients TriVascular's smaller-profile, less-invasive stent graft is explicitly not designed to treat.

Lombard's motion for a preliminary injunction depends on interpreting the phrase "any location" in the non-competition agreements it required its employees to sign to mean "any country," and on factually inaccurate claims that its business interests are threatened.  If the motion is granted, two at-will employees will pay a harsh price for trying to find a more rewarding use of their skills and experience, while if the motion is denied, Lombard will suffer no harm.  Accordingly, defendants respectfully request that the Court deny plaintiff's motion for a preliminary injunction.

MEI 10202012v.4

## FACTS

### *TriVascular's Clinical Trial of Its Ovation Stent Graft*

TriVascular designs and manufactures a specialized abdominal stent graft known as the "Ovation Abdominal Stent Graft." Designed to repair abdominal aortic aneurysms, the Ovation stent graft is based on a novel design, featuring small hollow passageways that are injected with special filler material after the stent graft has been navigated through a patient's blood vessels to the location of the aneurysm being treated. Chobotov Aff. ¶¶2-3.

Since 2008, TriVascular has received capital investments of approximately $95 million and has grown from three to nearly 250 employees. It continues to hire employees in a number of areas. Chobotov Aff. ¶¶4-5.

TriVascular is currently conducting an FDA-approved clinical trial of its Ovation stent graft. TriVascular has already identified all of the hospitals and medicals centers that will participate in its clinical trial, and has obtained commitments from the hospitals to participate. Chobotov Aff. ¶¶6-7. TriVascular has already finalized and obtained FDA approval for the protocol for its clinical trial. Chobotov Aff. ¶¶2; Allen Aff. ¶7. Of course, the design of the Ovation stent graft, which is patented, has already been completed. Any attempt to change the clinical trial protocol or product design could require considerable delay and expense, and would involve FDA approval. Chobotov Aff. ¶¶6-7.[1]

TriVascular expects to obtain FDA approval for the Ovation stent graft sometime in 2012. Until it receives that approval, however, it cannot market the device anywhere in the United States. Two years away from market, TriVascular is focusing its efforts on conducting a

---

[1] None of the hospitals and medical centers participating in the clinical trial are located in Massachusetts, nor has TriVascular attempted to sell any of its stent graft products in Massachusetts. Chobotov Aff. ¶8.

MEI 10202012v.4

clinically sound FDA-clinical trial and is not interested in information about any other company's marketing strategy or business strategy. Allen Aff. ¶9.

### *TriVascular's Need for Qualified Clinical Field Specialists*

To carry out an effective FDA-clinical trial, TriVascular needs employees who can train participating physicians on how to use its stent graft, encourage them to identify qualified patients, facilitate compliance with the clinical trial protocol for enrolling a patient in the clinical trial and stand next to the participating physicians in the operating room during actual surgeries to offer any technical advice and support the physician might request while using the device. At TriVascular, employees who perform these functions are called Clinical Field Specialists. Allen Aff. ¶10.

Over the past several months, TriVascular has been hiring Clinical Field Specialists to carry out its clinical trial. It looks for the following qualifications: a bachelor's level degree in life sciences, medicine, nursing or another technical discipline; at least four years' experience in training healthcare providers in the use of medical devices that facilitate minimally invasive surgery; general experience in the field of minimally invasive cardiovascular surgery; and general experience and knowledge regarding clinical studies and FDA regulations. Qualified candidates are hard to find. Allen Aff. ¶11.

### *Johannessen and Sassler Join Lombard*

Johannessen and Sassler have know each other for about 19 years and have worked together at several different companies. Johannessen Aff. ¶4; Sassler Aff. ¶4. They each have more than 20 years of experience training and informing physicians, especially radiologists, cardiologists and vascular surgeons, and other medical professionals, about how to deploy a

4

variety of different types of stents, catheters and other medical devices.  Johannessen Aff. ¶3; Sassler Aff. ¶2.

Johannessen accepted employment at Lombard Medical Technologies, Inc. in August 2007.  At Johannessen's suggestion, Sassler joined him there a few months later.  Johannessen Aff. ¶¶6-7.  Johannessen and Sassler were hired to help Lombard conduct an FDA clinical trial of Lombard's "High Angle AORfix™" Bifurcated Stent Graft" to treat abdominal aortic aneurysms ("AAA").  Johannessen Aff. ¶8; Sassler Aff. ¶6.

Even though Lombard's AORfix stent graft and TriVascular's Ovation stent graft are both intended to treat AAA, the products are based on fundamentally different designs.  The hollow passageways, designed to be injected with special filler material after the stent graft has been navigated through a patient's blood vessels, of TriVascular's stent graft are completely unlike Lombard's AORfix stent graft.  Chobotov Aff. ¶3.

The TriVascular and Lombard products also target different patient populations. Lombard's High-AORfix Bifurcated Stent Graft is designed primarily to treat the small percentage of patients who have high-angled aortas, or aortas defined by a 60 to 90 degree bend.[2]  TriVascular's Ovation stent graft, on the other hand, is designed to treat normal aortas with less than 60 degrees of bend.  TriVascular's FDA approved clinical trial does not permit TriVascular's Ovation Stent to be introduced in patients aortic angles measured at more than 60 degrees.  Chobotov Aff. ¶11.

---

[2] While Lombard's stent graft can be introduced into patients with normal or regular angled aortas, stent grafts with much smaller delivery system profiles that can be delivered less invasively than the Lombard stent graft are available for these patients.  Lombard acknowledges that its product is targeted to high angle patients in its 2009 Annual Report, which is posted on Lombard's website, and in the description of its clinical trial which is posted on the website www.clinicaltrials.gov.

### *Johannessen's and Sassler's Duties at Lombard*

Johannessen and Sassler were assigned to work at specific medical centers that had previously agreed to participate in Lombard's clinical trial. At each location, they were responsible for encouraging physicians to evaluate patients for possible inclusion in the trial, reviewing images and other objective data to confirm whether a patient met the participation criteria set forth in the trial protocol, and attending surgeries to offer the surgeons guidance about the mechanics of implanting the Lombard stent graft. Johannessen Aff. ¶¶8-9; Sassler Aff. ¶¶7-8.

Johannessen and Sassler were not involved in the design of the Lombard clinical trial or involved in negotiating any clinical trial agreements with medical centers. Supp. Johannessen Aff. ¶¶18-19; Supp. Sassler Aff. ¶¶18-19. The identity of contacts and key decision makers at the medical centers that are participating in Lombard's clinical trial is publicly available and posted on the web, complete with phone numbers and e-mail addresses. Supp. Johannessen Aff. ¶21; Supp. Sassler Aff. ¶21. It was not their job to identify hospitals or physicians that might be good candidates for the clinical trial or to persuade medical centers or physicians to participate. Johannessen Aff. ¶9; Sassler Aff. ¶9.

During their two-and-a-half-year employment at Lombard, Johannessen and Sassler learned no confidential information about Lombard's stent graft. The design of the product and how it works is described publicly and in detail, including in scholarly articles, in patent filings and on Lombard's website. Supp. Johannessen Aff. ¶3; Supp. Sassler Aff. ¶3. If any additional information about the Lombard stent graft remains secret, neither Johannessen nor Sassler knows it, or if it is technical, would understand it, as neither has an advanced understanding of engineering, physics or chemistry. Supp. Johannessen Aff. ¶4; Supp. Sassler Aff. ¶4.

Johannessen and Sassler learned how to use the Aorfix stent graft while at Lombard, but what they learned is not confidential. Lombard's 36-page booklet of instructions for using its stent graft is posted on its website. Johannessen Aff. ¶13, Ex. C. Johannessen and Sassler learned nothing at Lombard about how to use a stent graft that would be of any use to anyone using TriVascular's fundamentally different Ovation stent graft. Supp. Johannessen Aff. ¶5; Supp. Sassler Aff. ¶5.

Johannessen and Sassler never saw anything resembling a Lombard business plan, other than Lombard's 2009 Annual Report, which is posted on its website, and a PowerPoint presentation, made to all U.S. employees in July 2009 providing an update on the Company's business in general terms, which was also made publicly to groups of potential investors. Supp. Johannessen Aff. ¶7; Supp. Sassler Aff. ¶7. Johannessen and Sassler never saw a Lombard marketing plan and had no involvement in developing any Lombard business plan or marketing plan. Their only discussion about anything that might be considered marketing was their participation in occasional conference calls in which they updated their superiors on recent surgeries, physician contacts and prospects for new patients who might enroll in the clinical trial. Supp. Johannessen Aff. ¶¶8-9; Supp. Sassler Aff. ¶¶8-9. They were not privy to any Lombard pricing or cost information, Supp. Johannessen Aff. ¶¶10-13; Supp. Sassler Aff. ¶¶10-13, or any confidential clinical trial data. Supp. Johannessen Aff. ¶14; Supp. Sassler Aff. ¶14.

### *Johannessen and Sassler Join TriVascular*

Johannessen and Sassler grew dissatisfied with their jobs at Lombard based on the company's termination or loss of a number of employees and postponement of a promised bonus, openly strained relationships among the company's top executives, the scarcity of high-angle patients and fear that their own jobs were in danger. Johannessen Aff. ¶¶17-24; Sassler

7

Aff. ¶¶15-22. In early 2010, Sassler noticed a clinical trial posted on the NIH "clinicaltrials" website, sponsored by TriVascular. In February 2010, both Johannessen and Sassler emailed their resume to an email address for job applicants on the TriVascular website. Neither Johannessen nor Sassler knew anyone at TriVascular or had ever communicated with anyone there. Johannessen Aff. ¶¶25-26; Sassler Aff. ¶25. After more than a month without further contact, in late March 2010, TriVascular arranged interviews and, in early May 2010, offered them employment as clinical field specialists. Both promptly accepted. Mann Aff. ¶¶5-6.

Shortly after accepting TriVascular's offer, both Johannessen and Sassler notified their supervisor at Lombard that they were resigning from the company and where they were going to work for TriVascular. Their superiors said that if they agreed to stay for 6 months or until Lombard enrolled 150 high-angle cases, the company would waive their non-competition agreements. Johannessen Aff. ¶28; Sassler Aff. ¶27. After they resigned, at Lombard's request, Johannessen and Sassler continued to perform their regular duties, more or less normally through the first week of June. Both individuals have returned to Lombard all of Lombard's property. Johannessen Aff. ¶30; Sassler Aff. ¶29.

Johannessen and Sassler began their employment at TriVascular on June 14, 2010. They spent their first week (until the Court's June 18, 2010 Temporary Restraining Order), learning about TriVascular's stent graft and how to use it. Johannessen Aff. ¶32; Sassler Aff. ¶31.

Neither Johannessen nor Sassler will be involved in selecting or negotiating contracts with TriVascular's clinical sites, designing or producing its stent graft, determining the protocol for its FDA clinical trial, or developing its marketing strategy or business plans. TriVascular has assured Johannessen and Sassler that for at least six months they will not work at any hospital in the same metropolitan area as a hospital that is participating in Lombard's clinical trial and their

jobs will not include contacting physicians or other medical professionals with whom they worked while at Lombard. Johannessen Aff. ¶¶32-33; Sassler Aff. ¶¶31-32; Allen Aff. ¶15.

Johannessen and Sassler have deep experience regarding the use of medical devices in minimally invasive vascular surgery and a demonstrated aptitude for training vascular surgeons, interventional radiologists and interventional cardiologists regarding new products. Allen Aff. ¶12. TriVascular seeks to employ them solely to make sure that its stent graft is used properly in the FDA clinical trial that TriVascular has already designed and launched. Allen Aff. ¶15.

## ARGUMENT

### NEITHER THE MERITS NOR THE EQUITIES JUSTIFY ENJOINING JOHANNESSEN AND SASSLER FROM WORKING AS CLINICAL FIELD SPECIALISTS AT TRIVASCULAR.

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurak v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunctive, Lombard must prove that: (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm without the injunction; (3) the balance of harms weighs in its favor; and (4) the injunction will not harm the public interest. *See Lanier Prof. Servs., Inc. v. Ricci*, 192 F.3d 1, 3 (1st Cir. 1999).

Lombard cannot succeed on the merits of its breach of contract claim against Johannessen and Sassler (or its derivative claim for tortious interference against TriVascular) for two reasons. First, neither employee will work in "any location in which [Lombard] operates or into which [it] directs [its products]." Thus, neither employee will breach the non-competition provision that Lombard drafted and required them both to sign. Second, Johannessen's and Sassler's employment with TriVascular poses no threat to any Lombard goodwill or confidential information.

ME1 10202012v.4

Nor can TriVascular show that it will face irreparable harm absent an injunction. Neither Johannessen nor Sassler has taken any Lombard documents or information. They sent only a Lombard-approved email to their Lombard contacts when they left. After they both told Lombard in early May that they intended to work for TriVascular, Lombard trusted them to continue performing their normal duties for a month. If Johannessen and Sassler resume employment at TriVascular, there is no reason to believe that Lombard will face any harm at all.

Thus, because Lombard cannot prevail on the merits and faces no harm absent an injunction, its motion for a preliminary injunction must be denied.[3]

## I.  LOMBARD CANNOT PREVAIL ON THE MERITS BECAUSE NEITHER JOHANNESSEN NOR SASSLER INTENDS TO WORK IN ANY LOCATION WHERE LOMBARD OPERATES OR DIRECTS ITS PRODUCTS AND BECAUSE NEITHER EMPLOYEE THREATENS ANY LOMBARD GOOD WILL OR CONFIDENTIAL INFORMATION.

### A.  Johannessen And Sassler Will Not Breach Their Agreements Because They Will Not Work In Any Location In Which Lombard Operates Or Into Which Lombard Directs Its Products.

The non-competition provision that Lombard seeks to enforce is the first sentence of Section 7 of the agreements Johannessen and Sassler signed. (*See* Compl., Ex. A, ¶7, Ex. B, ¶7.) The sentence provides that Johannessen and Sassler may not engage in certain business activities in "the Restricted Region," which is defined in the last sentence of Section 7 to mean "any location in which the Company operates or into which the Company directs the Products or Services." *Id.*

Lombard currently sells its stent graft commercially in Europe, but in the United States, its stent graft is available only through Lombard's ongoing FDA clinical trial. The Lombard clinical trial is being conducted only at specific publicly identified hospitals. (*See* Sassler Aff.

---

[3] As explained in defendants' June 18, 2010 Opposition brief at pages 8 and 9, the motion should also be denied because Lombard has failed to establish personal jurisdiction over the defendants.

¶11, Ex. B.)  The only other U.S. location in which Lombard has operations is its U.S. headquarters in Tempe, Arizona.

Neither defendant will work in any of these locations.  During the term of their non-competition agreements, TriVascular will assign Johannessen and Sassler only to metropolitan areas in which Lombard has no clinical trial sites.[4]

Lombard seems to assume that the phrase "any location" is synonymous with "any country" and argues that the non-compete restrictions cover the entire United States.  (*See* Lombard Memo. of Law, p. 13; Transcr. of June 18, 2010 Hearing, at 12:22-25.)  But "location" means "a position or site occupied or available for occupancy or marked by some distinguishing feature" or "a tract of land designated for a purpose." *See* Merriam-Webster's Online Dictionary, *http://www.merriam-webster.com/dictionary/location.*  The word refers to specific sites, not to entire countries.

In the context of employees hired to facilitate a clinical trial at specific medical centers -- for a company that distributes its products nowhere else -- it is logical to use the phrase "in any location" to mean the places where Lombard's product is available and where the employees spent their time.[5]  By contrast, if Lombard's interpretation were right, the non-compete provision would cover not only the entire United States, but all of Canada, where part of Lombard's clinical trial is being conducted, and all or most of Europe, where Lombard currently sells its products -- surely an unreasonable interpretation.

---

[4] These restrictions are not a mid-litigation concession.  In a May 28, 2010 letter (several weeks before TriVascular's suit), TriVascular assured Lombard: "During the non-compete periods specified in their agreements with Lombard, Messrs. Sassler and Johannessen will not provide services to any clinical sites or customers with whom they worked at Lombard." (*See* Sassler Aff. Ex. E.)

[5] Locations into which Lombard hopes to direct its products sometime in 2011 -- after the term of the non-competition provisions has expired -- are not locations in which Lombard "operates" (present tense) or into which it "directs" (present tense) its products.

Employee non-competition agreements drafted by an employer are construed against the employer. *Lanier Prof. Servs., Inc. v. Ricci*, 192 F.3d 1, 4-5 (1st Cir. 1999) (affirming trial court's denial of preliminary injunction where employer used ambiguous term to define scope of post-employment restriction); *Sentry Ins. v. Firnstein*, 14 Mass. App. Ct. 706, 707 (1982) (affirming trial judge's interpretation of debatable language in employee restrictive covenant to prohibit only solicitation); *see also FLEXcon Co. v. McSherry*, 123 F. Supp. 2d 42, 43-45 (D. Mass. 2000).

In *FLEXcon*, an employer argued that the phrase "territories in which I worked for the Company" precluded a manager from competing anywhere in the United States where the manager allegedly had access to confidential information about the employer's operations nationally. Finding the word "territories" unclear and the non-competition clause "ambiguous and poorly drafted," however, the Court rejected the employer's interpretation and denied its motion for a preliminary injunction. *Id.*[6]

In this case, Johannessen and Sassler will not work in any location in which Lombard operates or into which it directs its products. If Lombard had wanted its non-competition agreement to cover any *country* in which Lombard operates or into which it directs its products, it could and should have drafted its agreement to say so. The language of section 7 of their agreements prohibiting Johannessen and Sassler from competing in any "location" in which Lombard operates or into which it directs its products does not fairly convey a nationwide

---

[6] Similarly, in *EMC Corp. v. Grisham*, 14 Mass. L. Rep. 128, 130-31 (Suffolk Super. Ct. Feb. 11, 2002), Judge van Gestel declined to enjoin a former employee from acting as a consultant for a competitor where the restrictive covenant at issue prohibited only ownership in, service as an officer or director of or holding a policy-making position at a competitor. "Where EMC, a sophisticated and knowledgeable entity, chose to embody its relationship with its key employees in a detailed and carefully crafted written instrument, " the Court wrote, "… it is entitled to and should be held to the contractual language it chose."

12

restriction.  Accordingly, Lombard cannot show a breach of its agreement and is not entitled to a preliminary injunction.

**B.    Johannessen's And Sassler's Employment With TriVascular As Clinical Field Specialists In Other Locations Does Not Threaten Any Lombard Goodwill or Confidential Information.**

Employee non-competition agreements "are scrutinized with great care because they are often the product of unequal bargaining power and because the employee is likely to pay little attention to potential hardships he or she may later suffer." *Sentry Ins. v. Firnstein*, 14 Mass. App. Ct. 706, 707 (1982).  A covenant not to compete is enforceable in the employment context only to the extent necessary to protect a legitimate business interest of the employer. *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 716 (1961).  Legitimate business interests include trade secrets, confidential information, and goodwill. *All Stainless, Inc. v. Colby*, 364 Mass. 773, 779-780 (1974).

As clinical field representatives assigned to the already-designed clinical trial of an already designed and fundamentally different stent graft and limited exclusively to non-Lombard locations, neither Johannessen nor Sassler threatens any Lombard good will or confidential information.

**1.    Johannessen and Sassler Do Not Threaten Any Lombard Good Will Because They Will Not Sell Anything Or Work With the Physicians or Hospital Personnel They Worked With At Lombard.**

As clinical field representatives, Johannessen and Sassler have been hired to train physicians to use TriVascular's Ovation stent graft at medical centers that have already agreed to participate in TriVascular's clinical trial, and to facilitate the enrollment of appropriate patients. They will not be asked to recruit physicians or hospitals for the clinical trial, which has already signed up its full complement of both.  They will not be asked to sell or market the stent graft, which will not be commercially available under any scenario until at least 2012.  Their specific

13

non-managerial role -- for a company that will not be selling anything until long after the non-compete period has expired -- poses no genuine threat to any Lombard good will. *See FLEXcon Co. v. McSherry*, 123 F. Supp. 2d 42, 44-45 (where former employee would be working for new employer as plant manager and not in a sales, marketing or business development role, FLEXcon "has not shown that its good will is seriously implicated).

Both Johannessen and Sassler brought with them to Lombard several decades worth of relationships with physicians and surgeons who diagnose and treat aortic disease. Lombard undoubtedly benefited from their personal good will with these physicians more than they benefited from any good will belonging to Lombard. Nevertheless, to avoid any argument that they might otherwise take advantage of relationships they developed in their two and a half years at Lombard, Johannessen and Sassler have agreed to refrain during the non-competition period from any work on behalf of TriVascular in any metropolitan area in which Lombard is conducting its clinical trial. The two employees have also agreed to avoid contact with any of their prior contacts at Lombard's clinical trial sites during the period of their non-competition agreements.

Given these restrictions, Johannessen's and Sassler's employment as clinical field specialists at TriVascular poses no genuine threat to any Lombard goodwill. *See All Stainless, Inc. v. Colby*, 364 Mass. 773, 780 (1974) (employer failed to show that its goodwill could have been harmed by activities of former employee outside of the specific sales territories assigned to him); *Speech Works Int'l, Inc. v. Cote*, 2002 Mass. Super. Lexis 390, *11 (Mass. Super. 2002) (declining to restrain employee beyond area he covered for former employer).

14

**2.    Johannessen's And Sassler's Employment At TriVascular Does Not Threaten Any Lombard Confidential Information Or Trade Secrets.**

To justify barring Johannessen and Sassler from working for TriVascular, Lombard must show that there is information that is:  (a) confidential; (b) known by Johannessen or Sassler; and (c) of potential value to TriVascular. *See Exeter Group, Inc. Sivan,* 2005 Mass. Super. LEXIS 257 (Suffolk Super. March 22, 2005); *see also Campbell Soup Co. v. Giles*, 47 F.3d 467, 469-70 (1st Cir. 1995).

In *Exeter Group*, a software company sought to enforce an employee's non-competition agreement, claiming that the employee had learned its proprietary methodology for implementing particular software.  Denying a motion for a preliminary injunction, Judge Burnes found that the employer failed to show that its methodology was proprietary, that the employee had taken anything confidential or that the methodology, even if it existed, would be of any use to the employee's new employer. 2005 Mass. Super. LEXIS 257 at *11-*14.  Similarly, in *Campbell Soup*, the First Circuit affirmed the trial court's denial of Campbell's motion for a preliminary injunction against an executive who left to become a sales manager for Progresso, including its findings that the Campbell marketing information that the executive knew was not truly confidential and that a truly secret Campbell project was not known to the executive.  47 F.3d at 470.

As in *Exeter Group* and *Campbell*, none of the items on Lombard's long list of information that is allegedly in jeopardy warrants injunctive relief.  On the contrary, as explained in detail below and in Johannessen's and Lombard's Supplement Affidavits, Lombard overstates what information is confidential, exaggerates what Johannessen and Sassler know, and overlooks the fact that none of the allegedly confidential information that it identifies would be of any use to TriVascular.

Much of the information Lombard identifies is decidedly not confidential. For example, detailed information about the design of the Aorfix stent graft and how to use it is publicly available on websites, in scholarly papers, on Lombard's website and in patent filings. *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 843, 850, 852 (1st Cir. 1985) (noting that a patentee must fully disclose a patented invention and that "once a trade secret enters the public domain, the possessor's exclusive rights are lost" and affirming trial court's finding that chemical process described in reports to the government that were later published could no longer be a trade secret). The design of Lombard's clinical trial is also public. Lombard has periodically disclosed to industry groups the status of patient enrollment in its clinical trial and its device failure rates and the information has been posted on the website "Vascular News."

To the extent there is any confidential information, Johannessen and Sassler, whose non-managerial role was to train and assist physicians and facilitate patient enrollment in Lombard's clinical trial, do not know it. For example, if any aspects of the Aorfix stent design remain secret, those aspects are secret from Johannessen and Sassler as well. Similarly, contrary to Lombard's allegations, Johannessen and Sassler do not know Lombard's pricing and cost information or the terms of its agreements with medical centers participating in its clinical trial.

Neither employee was involved in Lombard's marketing and business development plans, and neither one knows Lombard's future marketing plans should it obtain the necessary FDA approval. They have never seen anything resembling a business plan or marketing plan other than PowerPoint slides from a general presentation made to all U.S. employees and shared with potential investors almost a year ago. They have not seen overall patient enrollment data for Lombard's clinical trial in more than four months, which is less recent than Lombard's last public update.

The weekly business and marketing strategy meetings Lombard claims Johannessen and Sassler attended were in fact occasional conference calls at which the two employees updated their superiors on their latest contacts with physicians who might refer patients and on new prospects for enrolling patients in the clinical trial. No marketing plans or strategies were disclosed to Johannessen or Sassler on any of these calls, other than to keep working to enroll qualified patients. *See Campbell Soup Co. Giles*, 47 F.3d 467, 469-470 (1st Cir. 1995) (marketing information that is commonly known cannot be considered confidential).

Finally, and most tellingly, neither Johannessen nor Sassler nor TriVascular has any use for any of the information that Lombard claims is confidential. *See Exeter Group, 2005 Mass. Super. LEXIS 257 at * 13.* TriVascular's patented product design, the protocol for its clinical trial and the terms on which medical centers will participate in the clinical trial have already been finalized. It has no possible interest in information about Lombard's product, clinical trial or agreements with medical centers. Indeed, TriVascular's head of regulatory affairs, Shari Allen, managed two FDA clinical trials involving AAA stent grafts before she joined TriVascular.

TriVascular will not be selling any stent grafts in the United States until at least 2012, so it is not interested in Lombard's U.S. marketing strategy, to the extent Lombard really has one. Even if both companies were able to sell their stent grafts tomorrow, TriVascular still would have no interest in Lombard's marketing plans or business strategies because the Lombard stent graft and the TriVascular stent graft are targeted at mutually exclusive patient populations.

In sum, there is nothing secret about Lombard's business that Johannessen and Sassler know that would be any use to TriVascular. Accordingly, enjoining Johannessen and Sassler from working for TriVascular would do nothing to protect any Lombard confidential information and allowing them to resume their employment would do nothing to threaten it.

## II.   LOMBARD WILL SUFFER NO HARM IF JOHANNESSEN AND SASSLER ARE ALLOWED TO WORK AS TRIVASCULAR CLINICAL FIELD SPECIALISTS.

If Johannessen and Sassler are permitted to go forward with their employment as clinical field specialists, Lombard will suffer no harm. Neither employee will work with or contact any of the personnel involved in Lombard's clinical trial. Thus there is no risk of disruption to Lombard's clinical trial (other than from their resignation, which of course Lombard cannot seek to enjoin).

As explained above, neither employee is in a position to threaten any Lombard confidential information. Given their honest conduct during the month Lombard allowed them to continue their employment after they announced their intent to join TriVascular and during the weeks since then, there is no reason to think they would disclose confidential information if they had any. *See FLEXcon Co. v. McSherry*, 123 F. Supp. 2d at 45 (denying preliminary injunction because employer showed no significant risk of irreparable harm where former employee's duties did not require him to disclose or use confidential information and where employee continued to have legal duty not to do so).

In its Memorandum of Law, Lombard argues that it needs an injunction because otherwise Johannessen and Sassler will inevitably use Lombard's confidential information to TriVascular's benefit, even if they try not to. (Memo. of Law at 14-17). As explained above, this argument is factually unfounded because, Johannessen and Sassler know nothing secret from Lombard that could benefit TriVascular.

The cases Lombard cites to support this contention are all strikingly different from the present case. For example, *C.R. Bard, Inc. v. Intoccia*, 1994 U.S. Dist. Lexis 15368 (D. Mass. 1994), involved a Program Manager with a staff of 16 employees who was on the Management Board of Bard's Cardiopulmonary Division and who "was charged with proposing and

18

developing the business and project plans" for a new Bard oxygenator and was "privy to all strategic, marketing and technical knowledge of Bard." *Id.* at *6. Bard's oxygenator and the oxygenator of the company the Program Manager left for were both still being developed. *Id.* at *7-*8.

Likewise, *Marcam Corp. v. Orchard*, 885 F. Supp. 294 (D. Mass. 1995), involved the Vice President of Development at a software company who managed a staff of 60 employees and a seven-figure budget. *Id.* at 296. The Vice President was directly responsible for research and development of a new product and "was privy to information pertaining to all aspects of the development and marketing of [the product]" right up until his departure for a competitor. *Id.* at 297.

*Boch Toyota, Inc. v. Klimoski*, 2004 Mass. Super. LEXIS 258 (Mass. Super. 2004), involved a finance manager who had full access to a "Rate Book" containing the rates at which a Boch auto dealership obtained financing from various banks, the dealership's markup to the consumer and how the profits were split with the bank. *Id.* at *2-*3. The finance manager was enjoined from working in the same role for Boch's head-to-head competitor, Herb Chambers. *Id.* at *11.

By contrast, Johannessen and Sassler supervised no one, had no responsibility or involvement in any business, strategic or marketing plan, and had no pricing information or responsibility for developing any product. In addition, in this case, TriVascular's stent graft and Lombard's are based on a fundamentally different design and the design of TriVascular's stent graft and of its clinical trial cannot be changed without additional FDA approval and the accompanying delay and additional expense. Thus, there is no basis to conclude that Johannessen or Sassler will inevitably use or disclose any Lombard confidential information. On

MEI 10202012v.4

the contrary, they could not use Lombard confidential information to assist their work at TriVascular even if they wanted to -- and even if they knew any.

On these facts, the only harm Lombard faces is the absence of two skilled and experienced employees. But non-competition agreement are not intended to protect employers from having their employees resign. An injunction forcing Johannessen and Sassler to seek other work would make it harder for them to support their families but it would do nothing to bolster Lombard's workforce.

## CONCLUSION

Johannessen and Sassler are non-managerial employees with decades of skills and experience regarding the use of medical devices in minimally invasive vascular surgery and a proven ability to train physicians effectively to use these devices. TriVascular seeks nothing but their skills. Their employment at TriVascular away from Lombard locations will not breach their non-competition agreement or pose any genuine threat to Lombard's good will or confidential information. Accordingly, Johannessen, Sassler and TriVascular respectfully request that Lombard's motion for a preliminary injunction be denied.

Respectfully submitted,
Defendants Nils H. Johannessen, Thomas R. Sassler
and TriVascular, Inc.
By their attorneys,

_/s/ Patrick J. Bannon_
Patrick J. Bannon, BBO # 635523
pbannon@mccarter.com
Nicholas W. Allen, BBO # 663409
nallen@mccarter.com
McCarter & English LLP
265 Franklin Street
Boston, MA  02110
(617) 449-6500

June 29, 2010

MEI 10202012v.4

## <u>CERTIFICATE OF SERVICE</u>

I, Patrick J. Bannon, hereby certify that on this 29th day of June, 2010, the foregoing Supplemental Opposition of Defendants to Plaintiff's Motion for Preliminary Injunction was electronically filed with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), pursuant to Local Rule 5.4(C).

/s/ Patrick J. Bannon_____

ME1 10202012v.4