UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LOMBARD MEDICAL TECHNOLOGIES, INC., )<br>Plaintiff, )<br>)<br>v. )<br>)<br>NILS JOHANNESSEN, THOMAS SASSLER, )<br>and TRIVASCULAR, INC., )<br>Defendants. ) | Civil Action No. 10cv10995-NG |

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE:**
**MOTION FOR A PRELIMINARY INJUNCTION**
July 2, 2010

Lombard Medical Technologies, Inc. ("Lombard") is seeking a preliminary injunction to prohibit its former employees, Nils Johannessen and Thomas Sassler, from working for its competitor, TriVascular Inc., in violation of their non-competition agreements. I find that Lombard has successfully demonstrated a likelihood of success on the breach of contract claim and that without injunctive relief, it will suffer irreparable harm. Accordingly, its motion for a preliminary injunction (**document #2) is GRANTED IN PART AND DENIED IN PART**, but only with respect to Johannessen and Sassler.

### I.   BACKGROUND

#### A.   Johannessen's and Sassler's Employment with Lombard

Lombard Medical Technologies, Inc. is a medical device company that develops products for use in the treatment of vascular disease. Its leading product is Aorfix, an endovascular stent graft that treats abdominal aortic aneurisms ("AAA"). It is designed to treat regular-angled aortas (those with less than 60 degrees of bend) and "high-angled" aortas (those with 60 to 90

degrees of bend). (Phillips Decl. ¶ 4.) Lombard has spent about $85 million dollars and 12 years developing Aorfix. (Id. ¶ 6.)

In order to receive approval to market a device from the Food and Drug Administration ("FDA"), a company must conduct clinical trials to demonstrate a certain level of safety and effectiveness. In 2005, Lombard began its clinical trials on Aorfix. (Phillips Decl. ¶ 7.) Implementing these clinical trials requires persuading medical centers to participate, apparently a competitive and resource-intensive process.

To aid with the operation and expansion of the Aorfix clinical trials, in 2007, Lombard hired both Nils Johannessen and Thomas Sassler as Investigational Site Specialists.[1] This job entailed identifying medical centers to participate, persuading them to refer patients to the clinical trials, meeting with doctors to discuss Aorfix and to evaluate its strengths and weaknesses, and participating in weekly conference calls with Lombard's business, marketing, regulatory, and clinical personnel, among other responsibilities. Johannessen and Sassler were Lombard's only Investigational Site Specialists, and as such, the public face of Lombard. (Phillips Decl. ¶ 17.)

According to Lombard, as Investigational Site Specialists, Johannessen and Sassler became familiar with Lombard's confidential information, including its technology, trade secrets, marketing plans, pricing data, non-public clinical trial data, information about the strengths and weaknesses of Aorfix, clinical trial design, agreements with medical centers, and contacts with key decisionmakers at medical centers. (See Compl. Ex. A § 2.) Lombard also trained Johannessen and Sassler about Aorfix, and gave them confidential information about the

---

[1] Johannessen began to work for Lombard on August 13, 2007, and Sassler on October 15, 2007. (Phillips Decl. ¶¶ 10-11.)

product. (Phillips Decl. ¶ 16.).[2]  In addition, Lombard invested substantial resources in helping Johannessen and Sassler to develop contacts and relationships with medical centers for the Aorfix clinical trials.  (Phillips Decl. ¶ 18.)

### B. The Non-Competition Agreement

Before beginning their jobs with Lombard, Johannessen and Sassler each signed the Agreement Regarding Inventions, Confidentiality, and Non-Competition ("Non-Competition Agreement").  (Compl. Exs. A, B.)  Section 7 of the Non-Competition Agreement provides that for six months after their departure from Lombard, they will not "directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity in the Restricted Region with respect to the Products or Services."  (Compl. Exs. A, B § 7.)  The "Restricted Region" is defined as "any location in which the Company operates or into which the Company directs the Products or Services."  (Id.) "Products or Services" means:

> the manufacture of, and conduct of clinical trials in connection with, the High Angle AORfix Bifurcated Stent Grant, or other products and services that are competitive with or similar to the products or services of the Company, or products of services which the Company has under development of which are the subject of active planning at any time during [the employee's] employment.

(Compl. Exs. A, B § 1(e).)

### C. Johannessen's and Sassler's Resignation and Employment with TriVascular

---

[2] Defendants dispute plaintiffs' characterization of this information as confidential. (Johannessen Supp. Aff. ¶ 5; Sassler Supp. Aff. ¶ 5.)  They also dispute that they had any involvement in or awareness of Lombard's business or marketing plans or pricing information. (Johannessen Supp. Aff. ¶¶ 3, 5, 6-13; Sassler Supp. Aff. ¶¶ 3, 5, 6-13.)

On May 4 and May 7, 2010, respectively, Johannessen and Sassler gave their one-month's notice of resignation. They informed Peter Phillips, the Founder and Chief Technology Officer of Lombard, that they would be working for TriVascular. (Phillips Decl. ¶¶ 30-32.) TriVascular is a competing medical device company that is also developing an endovascular stent graft to treat AAA. Like Lombard, TriVascular is conducting clinical trials for its own stent graft in order to secure FDA approval. (Mann Aff. ¶ 2; Chobotov Aff. ¶¶ 2-9.) Johannessen and Sassler accepted positions as Clinical Field Specialists, whose responsibilities include managing clinical trials at various hospitals. (Mann Aff. ¶ 2.)

On May 14, John Rush, Lombard's Chief Executive Officer, met with Johannessen and Sassler to inform them that their employment with TriVascular would violate their Non-Competition Agreements. He also asked them to reconsider. (Rush Decl. ¶¶ 4-5.) They rejected Rush's offer. Lombard then contacted TriVascular to inform them that Johannessen and Sassler would be in violation of their Agreements and that its employment of them would interfere with the Non-Competition Agreements. (Rush Decl. ¶ 6; Rosenfeld Decl. ¶ 5; Exs. B, C.) TriVascular disputed this assessment and affirmed it would be hiring Johannessen and Sassler. Lombard filed this suit soon thereafter.

## II. PROCEDURAL HISTORY

Plaintiffs brought suit on June 15, 2010, alleging breach of contract by Johannessen and Sassler and tortious interference with contractual relations by TriVascular. On the same day, they filed a motion for a temporary restraining order ("TRO"), seeking to enjoin Johannessen and Sassler from working at TriVascular and TriVascular from hiring Johannessen and Sassler. Judge Stearns held a hearing on June 18, 2010, and found there to be a likelihood of success

based upon the Non-Competition Agreements. He granted the TRO, but only against Johannessen and Sassler, not TriVascular. On June 29, 2010, this Court held a hearing on the motion for a preliminary injunction.

## III. DISCUSSION

### A. Personal Jurisdiction

Defendants argue that this Court does not have personal jurisdiction over them because they do not have sufficient contacts with Massachusetts. I will examine these issues in the context of this motion for a preliminary injunction, bearing in mind that the issues may be more fully briefed at a later time. To establish personal jurisdiction, Lombard must satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution. Because "the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States," Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002), I need only address the constitutional analysis.

For a Massachusetts court to exercise personal jurisdiction over out-of-state defendants, the defendants must have sufficient minimum contacts "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted). The First Circuit has created a three-part due process analysis:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary

> presence before the state's courts foreseeable. Third, the exercise of
> jurisdiction must, in light of the Gestalt factors, be reasonable.

Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (internal quotations omitted).

Until May 1, 2010, Lombard was a Massachusetts company located in Wellesley Hills, Massachusetts. It has since moved to Arizona. In 2007, Johannessen and Sassler signed the Non-Competition Agreements, which contained Massachusetts choice of law provisions, and mailed them back to Lombard in Massachusetts. (Phillips Supp. Decl. ¶ 28.) In addition, Johannessen and Sassler received paychecks from Lombard, sent weekly expense reports and weekly work updates to Lombard, generated clinical trial sales for Lombard and would, from time to time, report in person to Lombard. (Id.)

These contacts are sufficient to give this Court jurisdiction over Johannessen and Sassler. Since Lombard's claim "arises out of" Johannessen's and Sassler's contracts, the first jurisdictional requirement is met. Second, their contacts were both voluntary and of a nature that they "could reasonably anticipate being haled into court there." World Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 297 (1980). They were employed by a Massachusetts' corporation, received paychecks from Massachusetts, and signed a contract with a Massachusetts choice of law provision. Thirdly, the Court's exercise of jursidiction is reasonable in light of the "Gestalt factors."[3] While appearing may impose some burden on defendants, who live in Maryland and Georgia, the burden is not so great as to be unreasonable. See Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir.1994) ("[T]he need to travel between New York and Puerto Rico creates no especially ponderous burden for business travelers."). Since the contract is governed by Massachusetts

---

[3] They are: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 209 (1st Cir. 1994).

law, and at the time defendants were employed at Lombard, it was a Massachusetts company, Massachusetts adjudicatory interests lean in favor of exercising jurisdiction. Finally, unifying this dispute in one court would allow for the most efficient resolution of the case. I find that Johannessen and Sassler have sufficient minimum contacts with Massachusetts to bestow jurisdiction upon this Court.

Lombard, however, has not demonstrated that this Court has personal jurisdiction over TriVascular. Lombard bases its claim for jurisdiction over TriVascular solely on TriVascular's alleged interference with the Non-Competition Agreements.[4] The First Circuit has found tortious interference with an in-state contract to be sufficient to grant jurisdiction. See Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1, 10 (1st Cir. 2009) (finding that Rhode Island federal court had personal jurisdiction over out-of-state defendant where defendant tortiously interfered with Rhode Island contract). But here, as discussed below, Lombard has not alleged facts sufficient to support a claim for tortious interference. Without more, I find for the purposes of this preliminary injunction that this Court does not have personal jurisdiction over TriVascular.

### B.      Motion for a Preliminary Injunction

#### 1.      Standard of Review

When considering a motion for a preliminary injunction, the court must consider whether plaintiff has demonstrated: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that a balance of the hardships weighs in its favor; and (4) that an injunction will benefit, or at least not harm, the public interest. ANSYS,

---

[4] TriVascular asserts that it does not have any sites in Massachusetts and does not provide any products or services in Massachusetts.

Inc. v. Computational Dynamics North America, Ltd., 595 F.3d 75, 78 (1st Cir. 2010). "The first factor, likelihood of success, is usually given particularly heavy weight." Id.

### 2. Likelihood of Success

#### a. *Breach of Contract Claim Against Johannessen and Sassler*

To succeed on their breach of contract claim, Lombard must show (1) the existence of a valid contract; (2) that it has performed its obligations under the contract; and (3) a breach of the contract that causes damages. Persson v. Scotia Prince Cruises, Ltd., 330 F.3d 28, 34 (1st Cir. 2003). The primary contested issues here are whether the Non-Competition Agreements are valid and whether Johannessen and Sassler breached them through their employment with TriVascular. Since the contract contains a Massachusetts choice of law provision, (Compl. Exs. A, B § 18), and neither party contests its applicability, Massachusetts law applies.

##### (1) The Non-Competition Agreement Is Enforceable

Non-Competition Agreements are enforceable only if they are "necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." Boulanger v. Dunkin' Donuts Inc., 815 N.E.2d 572, 577 (Mass. 2004).

Courts will not enforce non-competition agreements meant solely to protect employers from run-of-the-mill business competition. Marine Contractors Co., Inc. v. Hurley, 310 N.E.2d 915, 920 (Mass. 1974). But the protection of "trade secrets, other confidential information, [and] . . . the good will the employer has acquired through dealings with his customers" constitute legitimate business interests. Id.; see also Alexander & Alexander, Inc. v. Danahy, 488 N.E.2d 22, 28 (Mass. App. Ct. 1986). Here, the Non-Competition Agreements are meant to protect all three.

During their employment with Lombard, Johannessen and Sassler were party to trade secrets and confidential information about Aorfix's workings, Lombard's clinical trial methodologies, and Lombard's contacts at various medical centers. While TriVascular argues that information about Aorfix and its clinical trials are publicly available (D.s' Opp. at 1), other information, including Aorfix's strengths and weaknesses and clinical trial analyses are confidential. See, e.g., Shipley Co., L.L.C. v. Kozlowski, 926 F. Supp. 28, 30 (D. Mass. 1996); New England Circuit Sale v. Randall, No. 96cv10840, 1996 WL 1171929, at *2 (D. Mass. June 4, 1996) (finding protection of confidential information to be legitimate business interest).

In addition, the Non-Competition Agreements are meant to protect Lombard's good will. As the public face of Aorfix, Johannessen and Sassler benefitted from Lombard's investment of considerable resources in ensuring continued relationships with various medical centers. When "the employer introduce[s] the client to the salesman or the salesman cultivated his relationship with the client while employed by the employer," the good will "belongs" to the employer. IKON Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125, 128 (D. Mass. 1999). Johannessen and Sassler are in a position to diminish Lombard's good will because their "close contact with the customer would lead the customer to associate the product with the salesm[e]n rather than with the former employer." Id.; see also Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995) (A business "has a legitimate interest in protecting the good will of its customers.").

The Non-Competition Agreements are reasonably limited in time. They impose only six month restrictions, and Massachusetts courts have frequently found significantly longer time restrictions to be reasonable. See, e.g., Blackwell v. E. M. Helides, Jr., Inc., 331 N.E.2d 54, 56 (Mass. 1975) (finding three-year restriction to be reasonable); Marine Contractors Co., 310

...
...

N.E.2d at 921 (finding that non-compete lasting less than three years was not excessive); All Stainless, Inc. v. Colby, 308 N.E.2d 481, 486 (Mass. 1974) (finding two-year restriction to be reasonable). Furthermore, a six-month restriction does not unduly hamper defendants' ability to earn a livelihood. Richmond Bros., Inc. v. Westinghouse Broadcasting Co., 256 N.E.2d 304, 307 (Mass. 1970).

The scope of the Agreements is also reasonable. The Non-Competition Agreements prevent Johannessen and Sassler from working in "location[s] in which the Company operates or into which the Company directs the Products or Services," (Compl. Exs. A, B § 7.). Lombard defines "Restricted Region" to mean the entire United States because it has sought out clinical sites across the country. (Pl.'s Reply at 14 n.5.) Agreements restricting an employee from working in areas in which his former employer operates are generally considered to be reasonable. See Marcam Corp., 885 F. Supp. at 299 (finding a nationwide geographic restriction to be reasonable so long as "it restricts a former employee from doing business in an area in which the company itself conducts business."); Kroeger v. Stop & Shop Companies, Inc., 432 N.E.2d 566, 571 (Mass. App. Ct. 1982) (holding that geographical limitation restricted to area where business operated stores was reasonable).

Finally, the Non-Competition Agreements are "consonant with the public interest." Boulanger, 815 N.E.2d at 577. Johannessen and Sassler signed the agreements freely and for compensation. The agreements are only as restrictive as necessary to protect Lombard's trade secrets, confidential information, and good will. In addition, the burden they impose on Defendant's is short-lived – just six months.

      **(2)    Johannessen's and Sassler's Employment Breaches the Agreement**

Defendants argue that Johannessen's and Sassler's employment will not breach the Non-Competition Agreement because (1) TriVascular is not in competition with Lombard; and (2) they will not work within a "Restricted Region." While a non-competition agreement "must be no wider than is necessary to afford reasonable protection to the employer," Wilson v. Clarke, 470 F.2d 1218, 1221 (1st Cir. 1972), defendants' reading would give Lombard too little protection.

The Non-Competition Agreement prohibits Johannessen and Sassler from being involved, directly or indirectly, in the "manufacture of, and conduct of clinical trials in connection with, the High Angle AORfix Bifurcated Stent Grant, or other products and services that are competitive with or similar to the products or services of the Company." (Compl. Ex. A § 1(e).) TriVascular claims its employment of Johannessen and Sassler will not violate this provision because its stent graft is "fundamentally different" from that of Lombard: They are targeted at different patients – Lombard's device is meant for those with sharp bends in their aortas, while TriVascular's is not – and the two products function in two very different ways – the Aorfix contains hollow structures and takes shape only after it has been implanted and injected with a filler, while Lombard's stent is made with a woven polyester fabric. (Chobotov Aff. ¶¶ 10-13.)

Defendant's interpretation of the contractual language "competitive with or similar to" is so narrow as to effectively make it a nullity. Under their view, Johannessen and Sassler would only be in breach if they worked on a product that targeted exactly the same clients, was made of the same material, and worked in exactly the same way. While the products may target slightly different segments of the population, there is considerable overlap. Both companies are

developing and testing stent grafts meant to treat AAA. As Lombard correctly points out, competing companies rarely offer identical products; what makes products competitors is that they seek to fill a common need. Two companies "are in direct competition not because they manufacture identical products, but because a consumer . . . would turn only to one of these entities' products to solve its problems. Purchasing both of these products would not be a sensible third course." Cereva Networks, Inc. v. Lieto, 13 Mass. L. Rptr. 694, 2001 WL 1228040, at *4 (Mass. Super. Ct. Oct. 12, 2001). The stents of Lombard and TriVascular are sufficiently similar to and competitive with each other to fall under the Agreement's prohibition.

The second argument can be dealt with quickly. The Agreement bars Johannessen and Sassler from working in "Restricted Region[s]," meaning "any location in which the Company operates or into which the Company directs the Products or Services." (Compl. Exs. A, B. § 7.) TriVascular tries to limit this term to mean only those specific hospitals in which Lombard is conducting clinical trials. It argues that since it has agreed not to assign Johannessen and Sassler to any of the hospitals participating in Lombard's clinical trial or even the same city as any hospital participating in the clinical trials, (Johannessen Supp. Aff. ¶ 21; Sassler Supp. Aff. ¶ 21), Johannessen and Sassler will not violate the letter of the agreement. But this is too narrow a reading. Lombard has defined "Restricted Region" to mean the whole United States. (Pl.'s Reply at 14 n.5.) Therefore, whatever city Johannessen and Sassler are assigned to work in, if it is for TriVascular, they are in violation of the Agreement.

b. ***TriVascular's Tortious Interference with the Non-Competition Agreements***

c.

To succeed on a claim for intentional interference with contractual relations, Lombard must show that "(1) [it] had a contract with a third party; (2) the defendant knowingly induced

the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 571 N.E.2d 1363, 1369 (Mass. 1991); see also Law Offices of Jeffrey S. Glassman v. Palmisciano, 690 F. Supp. 2d 5, 17 (D. Mass. 2009). Lombard has demonstrated the first element – it had a valid contract with Johannessen and Sassler. But it has not offered any evidence to demonstrate that TriVascular induced Johannessen and Sassler to break their contract, and certainly none to demonstrate that TriVascular had an improper motive or used improper means. In fact, it appears that Johannessen and Sassler, unhappy at Lombard, contacted TriVascular's human resources department without any solicitation. ( Johannessen Aff. ¶¶ 17, 25-27, Ex. D.; Sassler Aff. ¶¶ 22-26, Ex. D; Mann. Aff. ¶ 4.) Lombard has not demonstrated a likelihood of success on this claim.

### 3.     **Irreparable Harm**

TriVascular insists that Johannessen's and Sassler's employment poses no threat to Lombard because information about Aorfix is of no value to it. According to TriVascular, it has already committed to its protocol and sites for its own clinical trials and cannot make changes now without FDA approval. Therefore, Johannessen and Sassler will not be "tempted" to disclose Lombard's confidential information. (D.s' Opp. at 6.).

In addition, Johannessen and Sassler assert that they simply have no confidential or relevant information to disclose. They will only work with surgeons who have already agreed to participate in the TriVascular clinical trial, so their jobs do not entail convincing surgeons to use one stent graft over another. (Johannessen Supp. Aff. ¶ 16; Sassler Supp. Aff. ¶ 16.) They also

claim they are not familiar with much of the confidential information Lombard fears they will disclose – the training they received about Aorfix is public and they had no involvement in Lombard's marketing plans or pricing data. (Johannessen Supp. Aff. ¶¶ 3, 5, 6-13; Sassler Supp. Aff. ¶¶ 3, 5, 6-13.) In addition, Johannessen and Sassler argue that much of the other information is public, including analyses of the clinical trials and information about the strengths and weaknesses of the product. (Johannessen Supp. Aff. ¶¶ 14-16; Sassler Supp. Aff. ¶¶ 14-16.) For these reasons, defendants assert that Lombard cannot demonstrate harm. See Wilson, 470 F.2d at 1221-22 ("[A]n employer may not enforce limitations on an ex-employee's engaging in activities which do no damage to the employer.").

Lombard counters that while it does make public some information about Aorfix, as required by the FDA, this is no way means it reveals *all* the company's confidential information. It lists several examples of proprietary information defendants were privy to, including information learned from doctors who have used Aorfix, the rationale behind choosing particular clinical trial designs and methodologies, and methods to deal with any obstacles encountered during surgery. Lombard also describes product development and marketing meetings at which Johannessen and Sassler were present. In addition, it alleges the two learned valuable information about what clinical trial decisions did and did not succeed.

Indeed, both sides have expended much paper arguing about whether Johannessen and Sassler were privy to particular conversations or present at certain meetings, and exactly what information was discussed at which medical conferences. Ultimately, the Court finds it difficult to believe that in their time at Lombard, Johannessen and Sassler did not pick up *any* confidential or proprietary information. Johannessen and Sassler are intimately familiar with the

-14-

weaknesses in Aorfix, have extensive contacts at medical centers through Lombard, and are knowledgeable about Lombard's non-public clinical trial analyses.  Even if they fully intend to protect Lombard's confidential information, they do not begin at TriVascular with "a tabula rasa with respect to [Lombard's] products, its development strategies, its marketing plans, its customers and other significant business information. It is difficult to conceive how all of the information stored in [their] memory can be set aside as [they] appl[y] [themselves] to a competitor's business and its products." Marcam Corp., 885 F. Supp. 294, 297 (D. Mass. 1995). See also Boulanger, 815 N.E.2d at 579 n.12 ("[W]orking for a competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove."); C.R. Bard, Inc. v. Intoccia, No. 94-11568-Z, 1994 WL 601944, at *3 (D. Mass. Oct. 13, 1994) (Former employee "could not and did not leave behind his special knowledge of plaintiff's operation, and in serving his new employer he will inevitably draw upon that knowledge.").  Further, Lombard has invested considerable time and resources into the development, testing, and evaluation of Aorfix. ($85 million dollars and 12 years (Phillips Decl. ¶¶ 4, 6.)), and any loss in competitive edge could be significant.

Despite defendants' assertions, it is impossible to imagine that they will not use, consciously or not, information they have gleaned during their time at Lombard.  And despite defendants' best intentions, as Judge Lindsay found in Marcam Corp., 885 F. Supp. at 297, given the similarities among the products and the defendants' positions at the companies, I find that disclosure would be inevitable.  Plaintiffs have successfully demonstrated that without injunctive relief, they will suffer irreparable harm.

### 4. **Balance of the Hardships and the Public Interest**

The harm to plaintiffs outweighs that of defendants.  Non-competition agreements by their nature impose some burden on former employees.  "That fact alone does not make such covenants unenforceable."  Marine Contractors Co., Inc., 310 N.E.2d at 921.   Johannessen and Sassler entered into the contract freely, and they may work for innumerable companies other than the seven that are in direct competition with Lombard.  Or they may indeed work for TriVascular; they just must wait six months to do so.

The public has an interest in the enforcement of valid contracts.  Bio-Imaging Technoligies v. Marchant, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) ("Enforcement of any covenant not to compete temporarily restricts the free alienability of employees but that alone is insufficient to abrogate a contract or render such covenants unenforceable.").  Given that the non-competition agreements here are relatively mild and are designed to protect Lombard's confidential information and good will, the agreements should be enforced.

## IV.     CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction **[document #2] is GRANTED IN PART AND DENIED IN PART**.


**SO ORDERED.**
**Date:   July 2, 2010**            */s/ Nancy Gertner*
                      **NANCY GERTNER, U.S.D.C.**